IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GRAHAM ENGINEERING CORP.**, | : | CIVIL ACTION NO. 1:18-CV-405 |
| | : | |
| Plaintiff | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **JOHN BRUNELLE** and | : | |
| **PROSYSTEMS INTEGRATION, LLC**, | : | |
| | : | |
| **Defendants** | : | |

## **MEMORANDUM**

Plaintiff Graham Engineering Corp. ("Graham") commenced this lawsuit against defendants John Brunelle and ProSystems Integration, LLC ("ProSystems"), asserting breach of implied contract, tortious interference with business relations, and civil conspiracy. Defendants move to dismiss Graham's complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (Doc. 9). We denied defendants' Rule 12(b)(2) motion with respect to the breach of contract claim, but permitted jurisdictional discovery on the remaining counts. Following limited discovery, we find that this court lacks personal jurisdiction over defendants on Graham's tortious interference claims.

**I.     Factual Background & Procedural History**

Graham is a Pennsylvania corporation specializing in, *inter alia*, package design, plastic processing, and extruder systems. (Doc. 1 ¶¶ 2, 8). Graham maintains a principal place of business in York, Pennsylvania. (Id. ¶ 2). ProSystems, a company organized in Rhode Island with its principal place of

business therein, designs control systems. (Id. ¶¶ 3, 11). Brunelle is the president of ProSystems and a citizen of Connecticut. (Id. ¶¶ 4, 10).

American Kuhne, a manufacturer of "extruders, extruder systems, extruder services[,] and other downstream equipment," contracted with ProSystems to supply specific control systems (known as "AKcess" systems) to each of American Kuhne's customers. (Id. ¶¶ 9, 12, 14-18). American Kuhne was originally located in Rhode Island. (Doc. 10-2 ¶ 22; see Doc. 1 ¶ 28). Graham purchased an 80% interest in American Kuhne in September 2012. (Doc. 1 ¶ 19). After Graham acquired this controlling interest, ProSystems continued to supply AKcess systems to American Kuhne upon request from 2012 to 2016. (Id. ¶¶ 22-23, 25-26; see id. ¶ 34). In January 2016, Graham purchased the remaining 20% interest in American Kuhne and became its sole owner. (Id. ¶ 27). Graham then relocated American Kuhne's manufacturing operations to Pennsylvania. (Id. ¶ 28).

The parties offer competing declarations concerning the nature of ProSystems' interactions with Graham. David Schroeder, president and chief executive officer of Graham, alleges that Brunelle routinely visited Pennsylvania to perform work for and build relationships with Graham and its customers. (Doc. 15-1 ¶¶ 9-10). He asserts that other ProSystems' employees also traveled to Pennsylvania to perform work for Graham's customers. (Id. ¶ 13). Schroeder states that the parties engaged in regular conference calls, often multiple times each week, to discuss open projects. (Id. ¶¶ 11-12). According to Brunelle, ProSystems' staff primarily interacted with personnel in Graham's Connecticut office. (Doc. 10-2 ¶ 25; see id. ¶ 24). He avers that ProSystems does not have employees, offices,

2

property, or phone numbers in Pennsylvania, and that ProSystems is not registered to do business in the Commonwealth. (Id. ¶¶ 5-6, 8-10, 12).

After acquiring American Kuhne, Graham issued offers of continued employment to certain American Kuhne employees. (Doc. 1 ¶ 29). All American Kuhne employees who accepted employment with Graham signed restrictive covenants. (Id. ¶¶ 30-31). Employees who declined offers remained subject to restrictive covenants executed with American Kuhne. (Id. ¶ 32).

According to the complaint, Brunelle began meeting with former American Kuhne employees and current Graham employees in July 2016 to form a new company, U.S. Extruders. (Id. ¶ 35). Brunelle purportedly pursued formation of this new entity despite his knowledge that many of these employees were subject to restrictive covenants which would prohibit formation of an entity in competition with American Kuhne and Graham. (Id. ¶ 36). Brunelle obtained a U.S. Extruders email address and joined an email group with former American Kuhne employees and current Graham employees, the purpose of which was to "strategize methods to compete with" Graham. (Id. ¶¶ 37-39). The individuals in this email group allegedly integrated ProSystems with U.S. Extruders. (See id. ¶ 43).

Graham avers that Brunelle and ProSystems thereafter took steps to end the parties' relationship. In August 2016, ProSystems increased pricing on Graham and created a "minimum order charge policy." (Id. ¶ 44). The following July, Brunelle informed Graham that ProSystems was relocating to a building also occupied by U.S. Extruders. (Id. ¶ 45). And in October 2017, ProSystems began refusing to provide Graham with "customer-specific downloads of control systems" that

3

Graham had previously ordered. (Id. ¶ 46). Brunelle also began "no-quoting" Graham. (Id. ¶ 47). On October 31, 2017, Brunelle notified Graham that ProSystems was terminating the parties' nondisclosure agreement. (Id. ¶ 48).

Graham commenced this action asserting breach of implied contract against ProSystems (Count I), tortious interference with business relations against both Brunelle and ProSystems (Counts II and III), and civil conspiracy against Brunelle (Count IV). Defendants moved to dismiss all counts under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. We denied defendants' Rule 12(b)(2) motion as to Count I and permitted jurisdictional discovery on Counts II through IV. The parties have completed this limited discovery and filed supplemental briefing and evidence on the question of personal jurisdiction.

## II.  **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss a complaint for lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well-pleaded factual allegations in the plaintiff's favor. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992). The court's review is not limited to the face of the pleadings, as consideration of affidavits submitted by the parties is both appropriate and required. Patterson by Patterson v. F.B.I., 893 F.2d 595, 603-04 (3d Cir. 1990) (citation omitted); see Carteret Sav. Bank, 954 F.2d at 146.

4

Although the plaintiff bears the ultimate burden of proving personal jurisdiction over a defendant, Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), the plaintiff need not make such a showing at the pleading stage of litigation. Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009). In the absence of a hearing, a court must accept the plaintiff's jurisdictional allegations as true and construe any disputed facts in favor of the plaintiff. Id. (citations omitted); O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007). Once a defendant has challenged the court's exercise of personal jurisdiction, the plaintiff must "prov[e] by affidavits or other competent evidence that jurisdiction is proper." Metcalfe, 566 F.3d at 330 (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)). Personal jurisdiction must be proven by a preponderance of the evidence. Control Screening LLC v. Tech. Application & Prod. Co. (Tecapro), HCMC-Vietnam, 687 F.3d 163, 167 (3d Cir. 2012) (quoting Carteret Sav. Bank, 954 F.2d at 146).

## III.   Discussion

A federal court may exercise personal jurisdiction over a nonresident of the forum state to the extent authorized by the law of the forum. See FED. R. CIV. P. 4(k)(1)(A). The Pennsylvania Long-Arm Statute grants jurisdiction coextensive with that permitted by the Due Process Clause of the Fourteenth Amendment. See 42 PA. CONS. STAT. § 5322(b). Our constitutional inquiry is guided by the "minimum contacts" test established in International Shoe Co. v. Washington, 326 U.S. 310 (1945). Under this test, the plaintiff must show that the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit

5

does not offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316 (internal quotation marks and citation omitted); see also Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007). The focus of the minimum contacts analysis is "the relationship among the defendant, the forum, and the litigation," Shaffer v. Heitner, 433 U.S. 186, 204 (1977), such that the defendant has fair warning that he may be subject to suit in that forum. Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001); Marten, 499 F.3d at 296. "[T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298 (1980) (internal citation omitted).

Federal courts must possess one of two forms of personal jurisdiction to comport with these principles. See D'Jamoos *ex rel.* Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-15 (1984)). General jurisdiction allows a court to exercise jurisdiction over all claims against a party that possesses contacts with the forum state so "'systematic and continuous' as to render them essentially at home" there. Daimler AG v. Baumen, 571 U.S. 117, 127 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (citing Helicopteros, 466 U.S. at 414 n.9)); Chavez v. Dole Food Co., 836 F.3d 205, 223 (3d Cir. 2016) (*en banc*). Specific jurisdiction, on the other hand, allows the court to hear only claims arising out of or relating to the defendant's contacts with the forum state. Helicopteros, 466 U.S. at 414 n.8; Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006).

In our February 2019 opinion, we determined that neither defendant was subject to general jurisdiction in Pennsylvania. See Graham Eng'g Corp. v. Brunelle, No. 1:18-CV-405, 2019 WL 931651, at *3 (M.D. Pa. Feb. 26, 2019) (Conner, C.J.). Consequently, Graham must demonstrate specific jurisdiction over the relevant defendant or defendants for Counts II, III, and IV to avoid dismissal of those claims. Graham can make such a showing through the traditional "minimum contacts" test or—because Graham is alleging intentional torts—under the "effects test" outlined in Calder v. Jones, 465 U.S. 783 (1984).

### A. Traditional Minimum Contacts Test

To exercise specific jurisdiction over a defendant, the court must find that (1) the defendant purposefully directed its activities at the forum, (2) each cause of action "arise[s] out of or relate[s] to at least one" of the defendant's activities, and (3) the exercise of jurisdiction "comport[s] with fair play and substantial justice." D'Jamoos, 566 F.3d at 102 (internal quotation marks and citations omitted); O'Connor, 496 F.3d at 317. The purposeful-availment and relatedness inquiries are often described as requiring "minimum contacts" between the defendant and the relevant forum. In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 558 (M.D. Pa. 2009) (Conner, J.) (citing Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 451 (3d Cir. 2003)). The defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum," but physical presence in the forum is not required. O'Connor, 496 F.3d at 317 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). "Unilateral activity" by a plaintiff "claim[ing] some relationship with a

nonresident defendant" is insufficient to establish that the defendant purposely directed its activities at the forum. D'Jamoos, 566 F.3d at 103 (quoting Hanson, 357 U.S. at 253); O'Connor, 496 F.3d at 317. Determinations of specific jurisdiction are generally claim specific because "the analysis depends on the relationship between the claims and contacts." Marten, 499 F.3d at 296 (citing Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001) (collecting cases)).

The court must also inquire whether exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." See Int'l Shoe, 326 U.S. at 316. Jurisdiction is presumptively constitutional upon a finding of minimum contacts, and the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Burger King, 471 U.S. at 477. Showing an absence of fairness or lack of substantial justice requires the defendant to overcome a heavy burden. Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.3d 476, 483 (3d Cir. 1993).

In our prior opinion, we noted that Graham's complaint was devoid of allegations showing that defendants' allegedly tortious conduct (in Counts II through IV) created the contacts necessary for this court to exercise specific jurisdiction over those claims under the traditional minimum contacts test. See Brunelle, 2019 WL 931651, at *5. Following jurisdictional discovery, Graham renews its contention that minimum contacts exist.

Graham misfires by failing to analyze the forum contacts on a claim-by-claim basis. (See generally Doc. 38 at 8-13). Specific personal jurisdiction determinations are "claim specific"; simply because the court has personal jurisdiction over a

defendant regarding one particular claim "does not necessarily mean it has personal jurisdiction over that same defendant" as to other claims asserted. See Remick, 238 F.3d at 255 (citations omitted). The three intentional torts at issue here concern different alleged wrongdoing and must be analyzed separately.[1] See id.

Graham also neglects to connect the forum contacts it alleges with the torts asserted. Most of the contacts Graham proffers are general in nature, *e.g.*, the parties doing $6,000,000 in business together and Graham being located in Pennsylvania, ProSystems offering services in all 50 states including Pennsylvania, ProSystems' employees regularly traveling to Graham's Pennsylvania facility, Brunelle meeting with coconspirators (with no indication of where those meetings occurred), *et cetera*. None of these allegations illustrate how the instant tort claims arise out of or are related to defendants' Pennsylvania contacts. Hence, we find that Graham has not met its burden of proving sufficient minimum contacts under the traditional test with respect to Counts II and III.

The principal connection Graham draws between specific conduct and an alleged tort is that Brunelle, purportedly carrying out his role in the conspiracy, traveled to Graham's facility in Pennsylvania "at least 5 times between January 2016 and October 2017" to keep Graham reliant on ProSystems' services. (Doc. 38

---

[1] If Brunelle's conduct materially differed from that of ProSystems, such distinctions would also have to be considered when reviewing a Rule 12(b)(2) challenge. However, it is clear that any relevant actions taken by Brunelle, whether alleged or admitted, were performed in his capacity as president of ProSystems. (See Doc. 38-1, Ex. G, Brunelle Dep. 4:11-5:9). In other words, when Brunelle acted, ProSystems did as well. Hence, we need not separate our jurisdictional analysis on Counts II and III by defendant, a step that would normally be required.

9

at 9). Graham likewise avers that Brunelle made numerous phone calls and sent emails into Pennsylvania to maintain business relations with Graham during this time. (See Doc. 38-1, Ex. E, Schroeder Decl. ¶¶ 11, 12, 15). According to Graham, Brunelle intended to artificially convey a normal business relationship throughout 2016 and 2017 and then "pull the rug out from under" Graham as soon as U.S. Extruders became operational, thereby drawing dissatisfied customers away from Graham and to U.S. Extruders. (See Doc. 1 ¶¶ 40-42, 54; Doc. 38 at 9-10, 12-13). We need not decide whether these Pennsylvania contacts are sufficient to establish personal jurisdiction over Brunelle on Count IV under the traditional minimum contacts test. Such conduct, allegedly undertaken to further a civil conspiracy against Graham, clearly satisfies the demands of the Calder effects test.

### B. Calder Effects Test

A plaintiff advancing an intentional tort claim may alternatively establish specific jurisdiction under the "effects test" outlined in Calder v. Jones, 465 U.S. 783 (1984). IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259-60 (3d Cir. 1998). The Calder effects test is to be applied narrowly. Id. at 263-64; Marks v. Alfa Grp., 369 F. App'x 368, 370 (3d Cir. 2010) (nonprecedential). Under this test, a court may exercise specific jurisdiction over a defendant when the plaintiff shows that (1) the defendant committed an intentional tort; (2) "[t]he plaintiff felt the brunt of the harm in the forum" rendering that forum the "focal point" of the harm resulting from the tort; and (3) the defendant *"expressly aimed"* his or her "tortious conduct at that forum such that the forum can be said to be the focal point of the tortious

activity." Marten, 499 F.3d at 297 (emphasis added) (quoting IMO Indus., Inc., 155 F.3d at 265-66).

The third element is often the touchstone of a Calder-based assertion of personal jurisdiction. Indeed, if this requirement is not satisfied, courts need not consider the preceding two prongs. See id. To establish the "expressly aimed" element, the plaintiff must point to specific activity by the defendant that is "deliberately targeted" at the forum. Id. at 298. That a plaintiff experienced a particular injury or harmful effect in a forum is insufficient to show the requisite contacts with that forum. See Walden v. Fiore, 571 U.S. 277, 290 (2014). Likewise, a defendant's mere knowledge of the plaintiff's connection with the forum does not alone satisfy this test. See id. at 289. Typically, some type of "entry into the forum state by the defendant" will be required. IMO Indus., Inc., 155 F.3d at 265 (internal citation marks omitted). The "relationship among the defendant, the forum, and the litigation" still guides the inquiry in intentional tort cases. Walden, 571 U.S. at 291 (quoting Calder, 465 U.S. at 788); IMO Indus., Inc., 155 F.3d at 265.

We begin by reiterating the intentional torts at issue. Under Count II, defendants purportedly encouraged and assisted former American Kuhne employees and current Graham employees to violate their restrictive covenants by forming U.S. Extruders to compete with Graham. (Doc. 1 ¶¶ 62-64, 71). According to Count III, defendants intended to harm Graham's relationship with its customers by withholding customer-specific downloads and "no-quoting" Graham, thereby benefitting competitor U.S. Extruders. (Id. ¶¶ 68-71). And in Count IV, Graham claims that Brunelle conspired with these former and current employees and

encouraged them to violate their restrictive covenants and to compete for Graham's customers by forming U.S. Extruders. (Id. ¶¶ 75-78).

Graham's presentation of the third prong of the Calder effects test—arguably the only element in dispute—is insufficient. Graham provides only three assertions to demonstrate that defendants' tortious conduct was "expressly aimed" at the forum: (1) defendants intentionally targeted and intended to harm Graham, a Pennsylvania corporation; (2) Brunelle used ProSystems to "tarnish" Graham's reputation with its customers and to inflict financial harm on it; and (3) defendants' actions negatively impacted Graham's relationship with three of its Pennsylvania-based customers (or "end users"). (See Doc. 38 at 15-16). Graham fails to present its analysis in claim-by-claim fashion. Accordingly, we endeavor to piece together the tort allegations and proffered contacts as best as possible.

### 1. *Tortious Interference with Business Relations (Counts II, III)*

The tort of intentional interference with existing "business relations" is often used interchangeably with the more common tort of intentional interference with contractual relations. See, e.g., Lico, Inc. v. Dougal, 216 A.3d 1129, 1131 (Pa. Super. Ct. 2019); Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. Ct. 1994); Dellape v. Murray, 651 A.2d 638, 640 (Pa. Commw. Ct. 1994); see also RESTATEMENT (SECOND) OF TORTS §§ 766, 766A (AM. LAW INST. 1979). The gravamen of Count II is alleged wrongful interference by defendants with existing non-compete agreements between Graham and third parties. See RESTATEMENT (SECOND) OF TORTS § 766 ("Intentional Interference with Performance of Contract by Third Person"). Count III contends that defendants tortiously interfered with

Graham's ability to perform contracts with Pennsylvania-based end users by refusing to provide Graham with necessary control-systems products and quotes on new control systems. See RESTATEMENT (SECOND) OF TORTS § 766A ("Intentional Interference with Another's Performance of His Own Contract").

We normally would consider these claims separately. However, we need not compartmentalize our analysis because Graham has failed to point to any specific tortious activity by defendants related to Counts II and III establishing that defendants deliberately targeted the forum. Targeting Graham, which happens to reside in Pennsylvania, is not the same as targeting Pennsylvania. A plaintiff alleging an intentional tort "must show additional facts connecting the defendant to the forum state" other than that the plaintiff was located in the forum at the time of the tortious conduct and felt the brunt of the harm there. Marten, 499 F.3d at 299; see also Walden, 571 U.S. at 289-90; IMO Indus., Inc., 155 F.3d at 263, 265. Moreover, Graham has not pled or provided evidence that defendants specifically intended to tortiously interfere with Graham's contracts with Pennsylvania-based end users. To the contrary, Brunelle testified that he generally did not know where particular end users were located when Graham would request control-systems products or services from ProSystems for these customers. (See Doc. 39-1, Ex. A, Brunelle Dep. 10:5-24).

Defendants further point out that Graham has not established that any "encouragement" to violate restrictive covenants occurred in Pennsylvania; that ProSystems ever provided services to the named Pennsylvania end users; that ProSystems or U.S. Extruders marketed toward Pennsylvania; that anyone from

13

ProSystems ever contacted a Pennsylvania end user about a new extruder company or U.S. Extruders specifically; or that any discussions or meetings between ProSystems and U.S. Extruders occurred in Pennsylvania. (See Doc. 39 at 11-12 (citing Doc. 39-1, Ex. A, Brunelle Dep. 21:14-25:18)). In light of the foregoing, we are compelled to find that Graham has not carried its burden to establish the third element of the Calder effects test on Counts II and III. That is, Graham has not proffered specific facts demonstrating that defendants expressly aimed their tortious conduct at Pennsylvania such that Pennsylvania was the focal point of the tortious activity. See Marten, 499 F.3d at 297-98; IMO Indus., Inc., 155 F.3d at 266. Because Graham has not satisfied this element, there is no need to consider the first two prongs of the test. Id. at 297.

### 2. *Civil Conspiracy (Count IV)*

Graham's civil conspiracy claim against Brunelle is different. Graham alleges that Brunelle carried on a course of conduct in furtherance of a conspiracy to undermine the restrictive covenants at issue. Some of the overt acts alleged include that Brunelle kept Graham reliant on ProSystems' services until U.S. Extruders was in a position to compete, then suddenly ended ProSystems' relationship with Graham to drive business away from Graham and toward U.S. Extruders. Brunelle's conduct included frequent emails and phone calls to Pennsylvania, as well as at least five physical trips into the state to carry out the alleged artifice.

This is the type of deliberate targeting of a forum that creates personal jurisdiction under Calder, including some form of "entry" into the state usually

required in intentional tort cases. See IMO Indus., Inc., 155 F.3d at 265. Brunelle purportedly conspired to interfere with existing restrictive covenants, the brunt of the harm of which was felt by Graham in Pennsylvania, and Brunelle's allegedly tortious conduct to further the conspiracy was "expressly aimed" at Pennsylvania. We conclude that this court has specific personal jurisdiction over Graham's conspiracy claim against Brunelle.

### C. Dismissal or Transfer of Counts II and III

Graham requests that, for any claim for which personal jurisdiction is found to be lacking, we transfer it to the District of Rhode Island pursuant to 28 U.S.C. § 1406(a). (See Doc. 38 at 16-17). Defendants oppose transfer. They maintain that any offending claims should be dismissed and that Graham, if it desires, can refile them in Rhode Island.[2] We disagree with defendants that it would be "unworkable" for the District of Rhode Island to parse the allegations in Graham's complaint and match them with the transferred counts. The tortious interference claims are not

---

[2] Defendants do not explicitly state whether the District of Rhode Island would have personal jurisdiction over them on Counts II and III. (See Doc. 39 at 20-21). As for ProSystems, personal jurisdiction in Rhode Island is indisputable. ProSystems is a Rhode Island company with its principal place of business there, (see Doc. 39-1, Ex. A, Brunelle Dep. 6:10-11; Doc. 1 ¶ 3), and thus general personal jurisdiction applies, see Daimler, 571 U.S. at 137. We are less certain with respect to Brunelle, who is a citizen of Connecticut. (See Doc. 1 ¶ 4). Brunelle admits that "everything was Rhode Island based" when referring to the at-issue meetings and emails between himself and the current and former Graham employees. (See Doc. 39 at 12, 23). This would appear to make Rhode Island's exercise of personal jurisdiction over Brunelle proper for Count II. Nonetheless, we cannot determine from the record whether Rhode Island could exercise personal jurisdiction over Brunelle on Count III. Graham has not provided any allegations or evidence that would inform the jurisdictional inquiry required for transfer.

15

particularly complicated. However, the question of whether this court can transfer Counts II and III requires further analysis.

We first note that the appropriate basis for transfer here is 28 U.S.C. § 1631 rather than 28 U.S.C. § 1406, as Section 1406 concerns improper venue. See Chavez, 836 F.3d at 224 & n.100; 28 U.S.C. § 1406(a). Section 1631 addresses the specific situation where, as here, "a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction." See 28 U.S.C. § 1631; Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 218 & n.9 (3d Cir. 2002) (explaining that Section 1631 permits transfer for lack of personal jurisdiction).[3] The statute provides that the original court "shall, if it is in the interest of justice, transfer such action . . . to any other such court" in which the case could have been brought when it was filed. 28 U.S.C. § 1631. Thus, a party seeking transfer under Section 1631 must show that (1) the claim or claims could have been properly brought in the intended transferee court, and (2) transfer would be in the interest of justice. There do not appear to be any issues regarding subject matter jurisdiction or venue in any prospective

---

[3] There is a circuit split regarding whether Section 1631's use of the word "jurisdiction" includes personal jurisdiction or contemplates only subject matter jurisdiction. See 15 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3842 & n.18 (4th ed. 2008). Third Circuit decisions, although never squarely addressing the question, clearly suggest that Section 1631 permits transfer for lack of personal jurisdiction. See Chavez, 836 F.3d at 224 & n.100; D'Jamoos, 566 F.3d at 107; Island Insteel Sys., 296 F.3d at 218 & n.9; Renner v. Lanard Toys Ltd., 33 F.3d 277, 284 (3d Cir. 1994); Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 544 (3d Cir. 1985).

transferee court, so our analysis under this first prong of Section 1631 is limited to personal jurisdiction.

### 1. *Count III Against Brunelle*

The first obstacle Graham cannot surmount involves Count III as alleged against Brunelle. Because we have no assurance that the District of Rhode Island could exercise personal jurisdiction over Brunelle on this claim, see *supra* note 2, Graham fails the first prong of the Section 1631 analysis. That is, Graham has not established that Count III against Brunelle "could have been brought" in the District of Rhode Island. See 28 U.S.C. § 1631.

However, dismissal of this claim would not be in the interest of justice. Assuming *arguendo* that Rhode Island could not exercise personal jurisdiction over Brunelle on Count III and the only appropriate forum for this claim is Connecticut (Brunelle's domicile), refiling there may be barred by the applicable statute of limitations. See Rossman v. Morasco, 974 A.2d 1, 15-16 (Conn. App. Ct. 2009) (noting three-year statute of limitations for tortious interference with contractual relations). In Connecticut, a claim for tortious interference accrues, for statute-of-limitations purposes, on "the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." Collum v. Chapin, 671 A.2d 1329, 1331-32 (Conn. App. Ct. 1996) (citing CONN. GEN. STAT. § 52-577). Graham alleges that Brunelle's tortious interference with Graham's contracts with its end users began in August 2016 and continued into 2017. (See Doc. 1 ¶¶ 44-47). Hence, we are unable to state with certainty that, under Connecticut law, this tortious interference claim would not be barred by the applicable three-year statute of limitations. Severance

and transfer of Count III against Brunelle, rather than dismissal, is in the interest of justice. See D'Jamoos, 566 F.3d at 110-11; White v. ABCO Eng'g Corp., 199 F.3d 140, 144-45 (3d Cir. 1999); FED. R. CIV. P. 21.[4]

### 2. *Count II Against Both Defendants and Count III Against ProSystems*

Graham's next barrier to Section 1631 transfer concerns Count II as against both defendants and Count III as against ProSystems. For these claims, Graham has failed to demonstrate that transfer is in the interest of justice. Specifically, there do not appear to be any statute-of-limitations concerns for Graham if it were to refile these tortious interference claims in Rhode Island. See Danziger & De Llano, LLP v. Morgan Verkamp LLC, __ F.3d __, No. 19-1986, 2020 WL 219006, at *5-6 (3d Cir. Jan. 15, 2020) (finding dismissal and denial of transfer appropriate when statute of limitations did not bar plaintiff from refiling in proper court); McBurney v. Roszkowski, 687 A.2d 447, 448 (R.I. 1997) (*per curiam*) (holding that ten-year statute of limitations found in R.I. GEN. LAWS § 9-1-13(a) applies to claims of intentional interference with contractual relations). Moreover, it would be easier for a Rhode Island court to start with a clean slate on these claims. Finally, if Graham desires to assert that Rhode Island has personal jurisdiction over Brunelle on Count III, see *supra* note 4, it can include this claim in its refiled complaint. We

---

[4] We acknowledge that Graham has not requested transfer to Connecticut. If Graham does not want to pursue this action in the District of Connecticut or believes it can establish personal jurisdiction over Brunelle on Count III in Rhode Island, it is free to voluntarily dismiss this transferred claim via notice of dismissal, provided that it files such notice before Brunelle serves an answer or a motion for summary judgment. See FED. R. CIV. P. 41(a)(1)(A)(i).

therefore conclude that the better course of action is dismissal without prejudice so that Graham—if it so chooses—can refile these claims in the appropriate forum.

## IV. **Conclusion**

We will grant in part and deny in part the remainder of defendants' motion (Doc. 9) to dismiss for lack of personal jurisdiction. We will deny the motion as to Count IV. We will grant the motion to the extent that we find that this court lacks personal jurisdiction over defendants as to Counts II and III and will dismiss Count II as to both defendants and Count III as to ProSystems. In the interest of justice, we will sever Count III as to Brunelle and transfer it to the United States District Court for the District of Connecticut. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: January 28, 2020